IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

BRETT SMITH,
*Petitioner.*

No. 20190550
Heard September 9, 2020
Filed March 1, 2022

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Vernice S. Trease
No. 171902685

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey S. Gray, Asst. Solic. Gen.,
Salt Lake City, for respondent

Stephen R. Frazier, Douglas J. Thompson, Provo, for petitioner

JUSTICE HIMONAS authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, and JUSTICE PEARCE joined.

ASSOCIATE CHIEF JUSTICE LEE filed a dissenting opinion in which
JUSTICE PETERSEN joined.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶1   This case contemplates the applicability of the community caretaking doctrine to the seizure of a man found sleeping in his car in a McDonald's parking lot by the police. At his suppression hearing, that man—Brett Smith—sought to exclude evidence found as a result of his warrantless seizure, claiming that the officers had violated his Fourth Amendment protection against unreasonable searches and seizures. Because we find that the State did not meet its

burden in rebutting this presumptively unreasonable seizure, we reverse the determination of the court of appeals.

## BACKGROUND

¶2    In the early hours of December 29, 2016, defendant Brett Smith was sleeping in his vehicle in the parking lot of a 24-hour McDonald's restaurant in West Valley City. A total of three cars were in the parking lot at the time, two of which belonged to the employees on shift. The McDonald's shift manager on duty approached Smith's vehicle around 2:30 a.m. to ask Smith to leave. After the manager made repeated attempts to gain Smith's attention, Smith finally responded, telling the manager that he would proceed through the restaurant drive-through. Smith then drove his car in a circle and re-parked. The shift manager then suggested to another manager that they contact the police. Police dispatch labeled the call a welfare check.

¶3    Officer Schipper was the first officer on the scene. Upon his arrival, Schipper parked directly behind Smith's vehicle, preventing Smith's egress. Schipper noted that Smith's "vehicle was on and running, and the [passenger] window was down." Before approaching to make contact with Smith, Schipper waited for backup. He later testified that he did so because "it was suspected as a possible DUI" and he believed that "when people are intoxicated, sometimes their behavior is unpredictable." "A few minutes" later, two more officers arrived in full uniform—including guns and badges—and parked alongside Smith's vehicle. The officers had parked in a manner intended to prevent Smith's vehicle from exiting and to allow the officers to shine "[a] spotlight directly" into the vehicle. The officers finally approached Smith's vehicle, with two officers on the driver's side and another officer flanking the passenger side. While one officer knocked on the driver's window, another was able to wake Smith by calling through the open passenger window. Smith then rolled down his driver's window, and the officers noticed "an odor of an alcoholic beverage," "a bottle of alcohol in a brown bag on the passenger seat," and Smith's "glazed" eyes and difficulty speaking and turning off the ignition. The officers then asked Smith to exit his vehicle and ordered him to perform a field sobriety test, the results of which indicated to the officers that Smith was intoxicated. Smith was then placed under arrest and subsequently administered a breathalyzer test. Smith's blood alcohol content, as indicated by the breathalyzer test, was .135, well over the legal limit. He was charged with driving under the influence of alcohol with prior convictions, operating a vehicle as an

alcohol-restricted driver, and driving on a suspended or revoked license. The latter two charges were later dismissed with prejudice as a result of Smith's *Sery* plea.

¶4 Smith moved to suppress evidence or statements obtained as a result of his seizure, claiming that he had been searched and seized in violation of the Fourth Amendment. In his motion to dismiss, Smith argued that his seizure and subsequent searches were unlawful because both intrusions were "conducted without a valid . . . warrant, and without any applicable exception to the warrant requirement." The district court found that Smith had been "seized under the Fourth Amendment when the officers parked their patrol cars immediately to the side of and behind Mr. Smith's car, preventing him from leaving." This finding was uncontested by the State. The State responded that there was an applicable exception — the community caretaking doctrine — and argued that the officers' intrusions were justified by the governmental interest in ascertaining whether Smith needed aid or presented a legitimate threat to the community at large.

¶5 The district court found that Smith's seizure was "justified" by the community caretaking doctrine, an analysis the district court drew from *State v. Anderson*, in which the degree of intrusion is balanced against the "seriousness of the perceived emergency and the likelihood that the motorist needs aid." 2015 UT 90, ¶ 28, 362 P.3d 1232. The district court determined that the "degree of restriction on [Smith's] freedom of movement was minimal because" Smith was asleep when the officers blocked his car, and that the "perceived emergency" of a man "sleeping in his car, in the middle of the night, in the middle of winter, with the car running" necessitated the "minimal" intrusion.

¶6 Smith entered a *Sery* plea, preserving his appeal of the denial of his motion to suppress. *See State v. Sery*, 758 P.2d 935 (Utah Ct. App. 1988). On appeal, a divided panel of the court of appeals affirmed. *State v. Smith*, 2019 UT App 75, 442 P.3d 251. The majority opinion found that *Anderson* was controlling and that the community caretaking exception applied. *Id.* ¶¶ 19–20. The dissent also found *Anderson* applicable but argued that the facts of the present case revealed that the seizure was not reasonable in light of the State's community caretaking interests. *Id.* ¶ 38 (Pohlman, J., dissenting).

¶7 Smith filed a petition for certiorari, which we granted. Smith's briefing echoes many of the points raised in the court of appeals' dissent and asks us to reverse on the ground that his seizure was unreasonable under *Anderson*. And the State, of course, asks us

to affirm. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(a).

**STANDARD OF REVIEW**

¶8 We review the decision of the court of appeals for correctness. *State v. Apodaca*, 2019 UT 54, ¶ 25, 448 P.3d 1255.

**ANALYSIS**

¶9  If those in the legal profession are to remember anything from an introductory criminal procedure course, it's that warrantless searches and seizures are presumptively unreasonable. *See, e.g., State v. Christensen*, 676 P.2d 408, 411 (Utah 1984) ("Warrantless searches and seizures are per se unreasonable unless" an exception applies that "require[s] action before a warrant can be obtained."). Here, Smith established that he had been seized for purposes of the Fourth Amendment and that the seizure had been effected without a warrant. The question we must answer in this case, then, is whether the State sufficiently rebutted that presumption. Though the State was able to point to the community caretaking doctrine as an exception to the warrant requirement, we find that the State failed to show the exception applied. The actions of the responding officers exceeded the State's interest in ensuring the public welfare of Smith and the community.

¶10 We begin with a brief explanation of the burden-shifting paradigm in a Fourth Amendment challenge. We then apply that paradigm to the case before us, finding that Smith sufficiently challenged his seizure as unreasonable and, thus, shifted the burden to the State to show the seizure was lawful. We then proceed to the merits—in short, Judge Pohlman's dissent in the court of appeals got it exactly right. As such, we quote from her dissent extensively. We find that, under the facts alleged, the community caretaking exception does not apply. We reverse the court of appeals and order the evidence obtained as a result of Smith's unlawful seizure suppressed.

I. THE BURDEN PARADIGM IN A FOURTH
AMENDMENT CHALLENGE

¶11 Under the Fourth Amendment, defendants enjoy the rebuttable presumption that a search or seizure is unreasonable if effected without a warrant. *See, e.g., Katz v. United States*, 389 U.S. 347, 357 (1967); *State v. Christensen*, 676 P.2d 408, 411 (Utah 1984). In *Katz*, the United States Supreme Court explained first that "the Constitution requires 'that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police.'"

389 U.S. at 357 (alteration in original) (quoting *Wong Sun v. United States*, 371 U.S. 471, 481–82 (1963)). In other words, a judicial officer must grant a warrant prior to a search or seizure. The United States Supreme Court then emphasized "that searches [and seizures] conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357 (citations omitted). This "per se" presumption means that the defendant is not obligated, in the first instance, to prove that a warrantless search or seizure was unlawful; rather, the defendant need only show that the search or seizure was conducted without a warrant. Upon this showing, the burden shifts to the State to prove that the search or seizure was lawful—that is, that it met an exception to the warrant requirement. *Id.*; *see also State v. Worwood*, 2007 UT 47, ¶ 39 n.50, 164 P.3d 397 ("[I]f a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search." (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977))); *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994) ("[The defendant] bears the burden of proving whether and when the Fourth Amendment was implicated . . . . The government then bears the burden of proving that its warrantless actions were justified."); *United States v. Murphy*, 402 F. Supp. 2d 561, 565 (W.D. Pa. 2005) ("[O]nce the defendant has established a basis for his motion, *e.g.*, that the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable."); *United States v. Steele*, 782 F. Supp. 1301, 1306 (S.D. Ind. 1992) ("[T]he defendant bears the burden of proving there was a seizure and then the burden shifts to the government to prove the seizure was justified (reasonable)."); WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 11.2(B), at 42 (6th ed. 2020) ("[I]f the police acted without a warrant the burden of proof is on the prosecution.").

¶12 Smith satisfied his burden in challenging his seizure as unreasonable under the Fourth Amendment. In his motion to suppress, Smith established that he had been seized and searched

without a warrant.[1] This is sufficient to shift the burden to the State to rebut the presumption of unreasonableness.

## II. MERITS

¶13 We now turn to whether the State met its burden here. We begin with an overview of the community caretaking exception and the standard we use to analyze it. We then turn briefly to the analyses of the court of appeals' majority and dissenting opinions, focusing in particular on the dissent, as it is our guiding light in our determination today. Finally, we turn to the facts of this case to determine whether the State showed that Smith's warrantless seizure was lawful. The State seeks to meet its burden by showing that the warrantless seizure was justified by the community caretaking doctrine. And while the community caretaking doctrine is a legitimate exception to the warrant requirement, we find that the State has failed to show that the exception applies here.

### A. *Community Caretaking and the* Anderson *Test*

¶14 The community caretaking doctrine recognizes that police activity is not limited to criminal investigations. Rather, an officer's duty to protect and serve extends to helping individuals in the absence of criminal activity. This might include "helping stranded motorists, returning lost children to anxious parents, [and] assisting and protecting citizens in need." *People v. Ray*, 981 P.2d 928, 931 (Cal. 1999). Utah courts have recognized this broader duty on several occasions. *See, e.g., State v. Anderson*, 2015 UT 90, 362 P.3d 1232 (holding that the community caretaking exception justified the warrantless seizure of a motorist parked on the side of a rural highway on a cold night); *Salt Lake City v. Davidson*, 2000 UT App 12, ¶ 11, 994 P.2d 1283 (recognizing the community caretaking

---

[1] Smith made the additional argument in his motion to suppress that the warrantless "seizure and subsequent searches were without reasonable suspicion or probable cause that a crime had occurred and thus in violation of Mr. Smith's protections under Utah and the U.S. Constitution." Given the aforementioned jurisprudence both in Utah and our sister jurisdictions, Smith satisfied his burden in challenging his seizure when he established that he had been seized without a warrant. The onus in showing whether the officers had reasonable suspicion or probable cause would be on the State (though this is not the State's argument here, as it seeks instead to justify the seizure under the community caretaking exception).

exception), *abrogated on separate grounds by State v. Adams*, 2017 UT App 205, 407 P.3d 1027; *see also Brigham City v. Stuart*, 547 U.S. 398, 401–403 (2006) (in which the U.S. Supreme Court analyzed Utah's separate but related "emergency aid doctrine," which recognizes a police officer's duty to aid someone "seriously injured or threatened with such injury" regardless of criminal activity).

¶15 This exception, no doubt, plays a crucial role in an ordered society. But we agree with Judge Pohlman, who authored the court of appeals' dissent, that "community caretaking is not intended to be a broad, freewheeling exception to the Fourth Amendment." *State v. Smith*, 2019 UT App 75, ¶ 26, 442 P.3d 251 (Pohlman, J., dissenting). It must be limited in application to prevent police from "us[ing] a suspicionless exception to the Fourth Amendment as pretext for ordinary criminal investigation." *Id.*

¶16 The court of appeals' majority and dissent both relied on our holding in *State v. Anderson*, 2015 UT 90. In that case, we adopted a standard for assessing community caretaking stops and articulated a balancing test to prevent misuse of the exception. These were the facts: Two sheriff's deputies noticed Anderson's car on the side of a rural highway with its hazard lights on. *Id.* ¶ 3. It was a "cold late-December evening" "[a]round 10:00 p.m." *Id.* "Because of the hazard lights, the cold weather, and the late hour, the deputies decided to stop and check on the welfare of any occupants of the vehicle." *Id.* The officers engaged their emergency lights, pulled up behind the parked vehicle, and approached on foot. *Id.* ¶¶ 3–4. Upon making contact with Anderson in the vehicle, the deputies "noticed that his eyes appeared to be bloodshot" and that he was unable to tell them which direction he was going. *Id.* ¶ 4. The officers ultimately "obtained a warrant authorizing them to arrest Mr. Anderson . . . and search his vehicle." *Id.* ¶ 5. The search produced "marijuana and drug paraphernalia." *Id.* Anderson later moved to suppress the evidence on the basis that the seizure was in violation of his Fourth Amendment rights, but the district court denied his motion, ruling "that the stop was justified by the community caretaking doctrine." *Id.* ¶ 6. This court affirmed and took the opportunity to make some clarifications in the law. In replacing the previous "life or limb" standard from *Provo City v. Warden*, 844 P.2d 360 (Utah Ct. App. 1992), we adopted the same standard used for searches and seizures based on suspicion of criminal activity — reasonableness:

> The Fourth Amendment does not prohibit all police seizures. It forbids only "unreasonable" seizures. Thus, [t]he touchstone of our analysis under the Fourth

Amendment is always "the reasonableness" of the seizure. The reasonableness of a seizure under the Fourth Amendment is determined by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.

*Anderson*, 2015 UT 90, ¶ 25 (alteration in original) (citations omitted) (internal quotation marks omitted). To put it another way, *Anderson* makes clear that the purpose of the balancing test is to determine the objective reasonableness of any police seizure, regardless of the degree of intrusion.

¶17 But we didn't leave it at that. We clarified that the community caretaking analysis requires the court to balance the interests of the State against those of the individual, specifically *with regard to the State's community caretaking purpose*. Here is what *Anderson* had to say about balancing the competing interests:

In applying this balancing test in the context of a community caretaking stop, courts must first evaluate the degree to which an officer intrudes upon a citizen's freedom of movement and privacy. In doing so, courts should look to both the degree of overt authority and force displayed in effecting the seizure and the length of the seizure. Second, courts must determine whether the degree of the public interest and the exigency of the situation justified the seizure for community caretaking purposes. In other words, how serious was the perceived emergency and what was the likelihood that the motorist may need aid? If the level of the State's interest in investigating whether a motorist needs aid justifies the degree to which an officer interferes with the motorist's freedoms in order to perform this investigation, the seizure is not "unreasonable" under the Fourth Amendment.

*Id.* ¶ 26 (citations omitted) (internal quotation marks omitted). Applying this test to the facts, we found that: (1) the seizure was "minimally invasive" because Anderson "was parked, rather than traveling down the highway, when he was seized," which "lessen[ed] . . . the deputies' interference with his" freedom of movement; and (2) the "perceived emergency" was serious given that "it was late December, . . . dark and very cold," and "a reasonable officer would have cause to be concerned about the welfare of a motorist in Mr. Anderson's situation." *Id.* ¶¶ 27, 28.

¶18 While we found that the community caretaking exception applied in *Anderson*, we emphasize that it is not a license with which an officer may circumvent the Fourth Amendment warrant requirement. Rather, courts will scrutinize whether the degree of the intrusion—taking into account both the force displayed and the length of the stop—was commensurate with the perceived public need for aid or protection. If the intrusion exceeds the need, the exception will not apply, and the stop will thus be found unreasonable.[2]

---

[2] The State asks us to reframe or "clarify" the standard set forth in *Anderson* and to adopt a standard that brings the community caretaking doctrine more in line with the law that governs police activity in criminal investigations. Specifically, it asks us to hold (a) that a community caretaking stop is "lawful at its inception" if there is an objectively reasonable basis to believe that the person stopped is in need of aid or that the circumstances pose a risk of danger to the public, and (b) such stop must be reasonable in the manner and scope of its execution, as judged by whether the intrusion looked more like a brief, investigatory encounter or a full-blown arrest.

We decline to adopt a new standard because we find that the current standard under the community caretaking doctrine, as articulated in *State v. Anderson*, 2015 UT 90, and in our extensive Fourth Amendment jurisprudence in general, is not only proper but also exactly what the State requests.

Objective reasonableness is, and always has been, the standard by which police stops are assessed. *See, e.g.*, U.S. CONST. amend. IV; *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968) (requiring that the officer "be able to point to specific and articulable facts" and requiring that "the facts be judged against an objective standard" of reasonableness). Reasonableness is "determined 'by balancing [a seizure's] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.'" *Anderson*, 2015 UT 90, ¶ 25 (quoting *Hiibel v. Sixth Judicial Dist. Ct.*, 542 U.S. 177, 187–88 (2004)). Moreover, the reasonableness of both a search and seizure has always been "evaluated objectively according to the totality of the circumstances." *State v. Warren*, 2003 UT 36, ¶ 14, 78 P.3d 590 (citing *Terry*, 392 U.S. at 21). A totality of the circumstances analysis is, ultimately, a fact-based inquiry, so we need not mandate court scrutiny based solely on whether the stop more resembled a brief,

(continued ...)

### B. *Application of* Anderson *in the Court of Appeals*

¶19 The court of appeals was unanimous in finding the *Anderson* balancing test controlling but was divided on how it applied to the facts in this case. The majority found that it could not "meaningfully distinguish this case from *Anderson*" and concluded "that *Anderson* compels the result in this case." *Smith*, 2019 UT App 75, ¶ 19. "Just as

---

investigatory stop or a full-blown arrest. And while our extensive Fourth Amendment jurisprudence is not limited to community caretaking stops, we made clear in *Anderson* that the standard is universal. 2015 UT 90, ¶ 26 ("This balancing between an individual's interest in being free from police intrusions and the State's legitimate interest in the public welfare that underpins a court's scrutiny of a seizure based upon suspicion of criminal activity also animates the community caretaking doctrine.").

And though the standard of reasonableness according to the totality of the circumstances applies to all police stops, regardless of the purpose of the stop, we stress that the purpose of the stop is a crucial factor in determining its reasonableness. Put another way, an officer engaged in an interaction with a known dangerous criminal would be justified in using more force than would be reasonable for an officer checking on the welfare of a sleeping motorist. Inversely, turning on the red and blues and tapping on the window of a car parked on the side of a rural highway on a cold night are actions certainly within the bounds of a welfare check, *see Anderson*, 2015 UT 90, ¶¶ 27–28, while unholstering a service weapon or, say, calling for backup before approaching the individual in need of aid could exceed reasonable community caretaking purposes. Of course, whether these actions would be reasonable under the totality of the circumstances is a fact-dependent question, and the onus is on the State to show the intrusion was, indeed, reasonable. And while it is true that police are not required to use the least intrusive means of protecting the community, *see Cady v. Dombrowski*, 413 U.S. 433, 447 (1973), they do not have free rein to carry out their community caretaking functions beyond the bounds of reasonable police behavior within the scope of their underlying purpose—according, of course, to the totality of the circumstances.

In summary, the State asks us to do what has already been done. We decline to adopt a new standard because there is nothing new to add.

in *Anderson*," the majority believed that "'the community caretaking doctrine justified the seizure,' because the officers' 'brief seizure' of Smith brought about only 'minimal interference with [Smith's] freedom of movement,' and because the State had a compelling 'interest in determining whether any occupants of the vehicle required aid under these circumstances.'" *Id.* (alteration in original) (quoting *Anderson*, 2015 UT 90, ¶ 30).

¶20 Judge Pohlman dissented. While she acknowledged a basis for "a welfare check of some kind" in the circumstances of this case, *id.* ¶ 24, she disagreed with the majority's application of the *Anderson* balancing test to the facts, stating that she would have "weigh[ed] the interests differently" and would have held "that the manner in which the officers performed the welfare check outstripped its justification." *Id.*

¶21 First, Judge Pohlman asserted that "the degree of overt authority displayed here was not as 'minimally invasive' as the majority suggests." *Id.* ¶ 30. She noted that "[t]hree officers and two squad cars responded to a routine 'welfare check,' and the three officers completely surrounded Smith, blocking any chance of escape," *id.*; that one officer had "shined his 'spotlight directly through' Smith's vehicle so that the officers would 'have the advantage over' Smith, *id.*; that "[a]ll three officers approached Smith's vehicle together, 'two on the driver's side' and 'one on the passenger's side,'" *id.*; and that the first officer's call for backup before approaching Smith "unreasonably prolonged Smith's seizure," *id.* This latter point was concerning to Judge Pohlman because, in her view, it indicated that the first responding officer had not been sufficiently "worried about Smith that he immediately checked on him"; rather, "he waited for backup to investigate a possible DUI," *id.*, an action "consistent with an investigative purpose" but "inconsistent with a public safety purpose," *id.* (quoting *State v. Kurth*, 813 N.W.2d 270, 279 (Iowa 2012)).

¶22 Second, Judge Pohlman suggested that "the 'perceived emergency' presented by Smith sleeping in his car was not . . . , serious enough to justify the severity of the officers' intrusion upon Smith's freedom of movement and privacy." *Id.* ¶ 31. She believed that "the officers could have accomplished any community-caretaking purposes with much less intrusive means." *Id.* ¶ 31 n.11. While "[a] brief seizure immediately upon arriving at the parking lot may have been justified," Judge Pohlman believed "it was not necessary to block in [Smith's] vehicle to do so." *Id.* ¶ 31 (second alteration in original) (citation omitted). Because the purported

"welfare check could just as easily have been accomplished by a single officer pulling up alongside Smith, knocking on the door, and asking Smith if he was all right," Judge Pohlman asserted that the "seizure was therefore unreasonable." *Id.* ¶ 31 & n.11.

¶23 Judge Pohlman also doubted that the officers were "motivated by a concern for the safety of members of the community." *Id.* ¶ 32 (citation omitted). At best, she felt that, under the district court's findings, "the officers here had only a generalized concern about the public," given that "there were no objective, specific facts" provided to the responding officers "that Smith or his car were a danger to anyone." *Id.*

¶24 And finally, Judge Pohlman disagreed with the majority's determination that *Anderson* was indistinguishable. She noted that Anderson had been pulled over on a rural highway with his hazard lights on while Smith was "in a parking lot of an establishment open for business." *Id.* ¶ 34–35. And whereas in *Anderson*, there was evidence that the temperature was remarkably cold—seven degrees below zero—here, there was "no evidence of how cold the night in question was," and "Smith had his engine running and was not far from an open McDonald's." *Id.* "The short of it," Judge Pohlman stated, was that "being stranded on the side of a rural highway in freezing temperatures . . . is poles apart from being parked in a McDonald's parking lot with a visibly functioning car." *Id.* ¶ 35. And she would have held that the manner in which Smith had been seized was not reasonable because it was not "commensurate" with the officers' "generalized concern about the public" and Smith's welfare. *Id.* ¶¶ 36, 32. "Rather, the officers went in aggressively from the start." *Id.* ¶ 36.

¶25 The majority offered a response to Judge Pohlman's concerns. It "acknowledge[d] . . . differences between" this case and *Anderson*, but did not "find them material." *Id.* ¶ 14 n.5. The majority insisted that, "[i]n both cases, the officers were motivated by the same purpose: checking on the welfare of the occupant of a parked car on a cold winter night." *Id.* It didn't "see any sense in a legal rule proclaiming that the use of three officers to conduct that kind of welfare check is too many, but the use of two officers is just fine," and saw "no meaningful distinction between an officer parking behind a parked car to cut off its escape, on the one hand, and an officer pulling up behind a parked car with lights flashing, on the other." *Id.* The majority believed that, "in both cases, the officer has used his vehicle to command the individual to remain in place, and in neither case is the detained individual free to go." *Id.* And the

majority was "not willing to fault officers, who are responding to a potentially dynamic situation, for taking precautions such as using a spotlight or waiting for backup." *Id.* It therefore held that Smith's seizure was reasonable under the community caretaking standard set forth in *Anderson.*

### C. The State Failed to Show that Its Intrusion on Smith's Freedom of Movement and Privacy Was Justified by Its Community Caretaking Interest—Moreover, the Facts Indicate that Smith's Seizure Was Not Reasonable

¶26 The State bore the burden of showing its community caretaking interest justified Smith's seizure—and it failed to do so. In so finding, we emphasize that the facts of this case—as presented by both parties—ultimately reveal that the officers' actions in seizing Smith were unreasonable given their community caretaking justification. The officers' conduct, rather, was perfectly consistent with a criminal detection and prevention mission from the beginning—as Judge Pohlman put it, "the officers went in aggressively from the start." *Smith*, 2019 UT App 75, ¶ 36 (Pohlman, J., dissenting). After restating the relevant facts—that is, those occurring during "the period of time from the initial seizure up until when the deputies approached [Smith's] vehicle and asked whether he required assistance,"[3] *Anderson*, 2015 UT 90, ¶ 27 n.1—we analyze them under the *Anderson* test and determine not only that the State failed to meet its burden in showing that the seizure was justified, but also that, based on the facts before us, the seizure was far from reasonable.

¶27 The story of Smith's seizure is comprised from several sources, none of which indicate objective evidence of any criminal wrongdoing prior to the moment the officers smelled alcohol on

---

[3] We concede that once the officers had engaged with Smith and observed his intoxicated state, they obtained probable cause to believe a crime had been committed. As such, any further police action would not need to be justified under the community caretaking doctrine. But we scrutinize the relatively small window of time before the officers engaged with Smith because the seizure began before the officers obtained probable cause to believe Smith had committed a crime. It is this window of time that requires the officers to have acted within the bounds of their community caretaking functions. *See Anderson*, 2015 UT 90, ¶ 27 n.1.

Smith's breath. The McDonald's shift manager who first approached Smith's vehicle did not provide any indication that he thought Smith was intoxicated, despite having spoken briefly with him. He testified only that Smith was asleep and that he drove around the restaurant when the manager woke him up. And even if this manager had suspicions about Smith's intoxication, he did not speak directly to the officers "until they asked him to 'fill out the form'" after the officers had seized Smith. And when the McDonald's managers contacted the police, the incident was dispatched as a "welfare check."

¶28 Nevertheless, the officers' response smacked of a criminal investigation purpose from the start. When Officer Schipper arrived, he parked directly behind Smith despite there being only three cars in the lot—thus, presumably, plenty of open stalls—and called for backup. He did so because "it was suspected as a possible DUI." And though this officer's subjective suspicion of a possible DUI must not factor into our reasonableness analysis, *see infra* ¶ 32 n.5, his conduct stemming from that suspicion is objective evidence that must be weighed within the totality of the circumstances. The record indicates no evidentiary basis upon which Schipper developed this suspicion, as the dispatch was for a "welfare check" and the dispatch "call notes" described "a male, slumped over the wheel, appeared to be sleeping"—no mention of possible intoxication. And no officer testified definitively as to whether Smith was parked illegally in the McDonald's parking lot. Another officer testified to his belief that Schipper parked behind Smith's car in order to be able to shine a spotlight into the vehicle, to prevent Smith from leaving, and to gain "an advantage over" Smith. Officer Schipper also waited for backup to arrive before personally approaching to check on Smith's wellbeing. It wasn't until two more officers arrived in full uniform— including guns and badges—that Smith was finally approached, with two officers on the driver's side and another officer flanking the passenger side.

¶29 Having reiterated these facts, it's now useful to frame them within the *Anderson* two-part test to determine whether the State has shown that Smith's seizure was reasonable. First, the court should "evaluate the degree to which an officer intrudes upon a citizen's freedom of movement and privacy" by looking to "'the degree of overt authority and force displayed' in effecting the seizure, and the length of the seizure." *Anderson*, 2015 UT 90, ¶ 26 (citation omitted). The positioning of Officer Schipper's vehicle behind Smith's car signaled his authority over Smith's freedom of movement and, by his colleague's own admission, was done to gain "an advantage

over" Smith. The fact that Officer Schipper's vehicle was positioned to allow him to shine a spotlight into Smith's vehicle buttresses this display of overt authority. Further, three officers in full uniform (and two squad cars) were ultimately involved in the so-called "welfare check," and the officers positioned themselves outside of Smith's vehicle in such a way as to leave no doubt that Smith was surrounded and unable to leave.[4] As for the length of the seizure, although Smith was asleep and presumably unaware of the first officer's arrival, Officer Schipper's choice to wait for backup before approaching Smith is inconsistent with the time it should have taken him to conduct a welfare check. The display of force and authority, in other words, was significant.

¶30   We should next look to the second *Anderson* test prong: "[W]hether 'the degree of the public interest and the exigency of the situation' justified the seizure for community caretaking purposes." 2015 UT 90, ¶ 26 (citation omitted). The seizure occurred in late December but, unlike in *Anderson* in which the temperature had dropped to seven degrees below zero, *id.* ¶ 28, the record here does not indicate that the weather was particularly cold or inclement. Further, the officers observed that Smith's vehicle was "running," which suggests that Smith could have used the vehicle's heating system to keep warm if needed. Also, unlike in *Anderson*, in which the defendant was on the shoulder of a rural highway with his hazard lights engaged, Smith's vehicle was idling in the parking lot

---

[4] The court of appeals' majority notes that it "cannot see any sense in a legal rule proclaiming that the use of three officers to conduct that kind of welfare check is too many, but the use of two officers is just fine." *Smith*, 2019 UT App 75, ¶ 14 n.5. Indeed, imposing a legal rule regarding the number of officers necessary to effect a community caretaking stop may be an arbitrary exercise. But we do not advocate for implementing such a legal rule in arguing that the number of officers involved in such a stop is, nonetheless, relevant. A packed school bus stranded in a blizzard will require the aid of more officers than needed to address a man sleeping in his car. While awaking to one officer knocking at a window might be fine, being surrounded by multiple officers and their vehicles is surely an "annoying, frightening, and perhaps humiliating experience." *See Terry*, 392 U.S. at 25. As such, the number of officers involved is concrete, objective evidence that must be weighed within the totality of the circumstances.

of an open business. And nothing in the record suggests that when approached by the McDonald's manager, Smith expressed a need for assistance. *See State v. Coffman*, 914 N.W.2d 240, 252 (Iowa 2018) (explaining that a motorist's location in a parking lot of an open business was evidence that tended to suggest there was no need for community caretaking intervention). In sum, the "perceived emergency" was not remarkably urgent or serious, and the "likelihood that [Smith] . . . need[ed] aid" was minimal. *See Anderson*, 2015 UT 90, ¶ 26.

¶31 Still, the State argues that Smith's seizure was justified by the suspicion that "Smith might be suffering from a medical incident and in need of aid, or that he was sleep-deprived or impaired and might drive away in that condition," thus posing a danger to others on the road. This suspicion arose, according to the State, "[b]ased on the McDonald's employees' report, together with the officers' observations upon their arrival." But the facts support neither rationale. The McDonald's manager who approached him did not report any suspicion that Smith was suffering a medical emergency or that Smith requested aid. And other than the officers' observation that Smith "appeared to be sleeping," the State does not point to any objective evidence of a medical incident requiring immediate aid. And as for the fear that Smith might drive away in a "sleep-deprived or impaired" condition, Smith's actions suggested the opposite—he drove around the restaurant parking lot after speaking with the manager and re-parked. This is the behavior of a man who wanted to stay put, not drive away. The State even argued this point below. In arguing that the intrusion upon Smith's freedom of movement was minimal, the State said: "The Defendant showed no indication that he wanted to go anywhere, and even remained in place despite being asked to leave. Thus, it would be impossible to conclude that officers interfered with the Defendant's right to go about his business." Yet the State now argues that Smith was a danger to the community because he "might drive away in that [impaired] condition." The State can't have it both ways. We emphasize that though Smith did not seem to pose a threat to the community in his slumbering state, the intrusion on his freedom of movement and privacy was evidenced not merely by the positioning of Officer Schipper's vehicle to prevent Smith's egress but by the overall display of authority and length of the seizure. *See supra* ¶¶ 28–29.

¶32 Weighing the *Anderson* prongs against one another, it is clear that, viewed objectively, the officers' conduct was beyond the bounds of their purported community caretaking function in this encounter. The significant force displayed was incommensurate with

the minimal need for aid. At best, the officers had only a secondary purpose in ascertaining Smith's wellbeing while simultaneously investigating a DUI;[5] at worst, the officers had no intention to provide aid and merely *post-facto* sought to justify a warrantless criminal seizure under the community caretaking doctrine. Either way, the exception does not apply. Under these objective facts, the State bore the burden of showing the officers had reasonable suspicion or probable cause to suspect criminal activity. Perhaps knowing it could not meet this burden, the State then sought to shoehorn its seizure into the community caretaking doctrine. It failed to meet its burden under that exception as well.

### D. *The Dissent Misapprehends Our Recent Case Law and Supreme Court Precedent on the Reasonableness of Warrantless Seizures and the Community Caretaking Exception*

¶33　Today's dissent views this case differently. It contends that the State's burden of proof for establishing the reasonableness of a warrantless search or seizure must be "framed and limited by the defendant's allegations." *See infra* ¶ 48. As such, the dissent believes that courts should consider only the specific facts and Fourth Amendment interests challenged by a defendant when evaluating the reasonableness of a warrantless search or seizure. The dissent asserts that when Smith first moved to suppress evidence obtained from his warrantless seizure, Smith failed to challenge several aspects of the intrusion that we have found so troubling on appeal— such as the police's use of a spotlight and the presence of multiple officers with guns and badges. The dissent also claims that Smith identified only one Fourth Amendment interest implicated by the seizure: his freedom of movement. The dissent contends that the law of preservation prevents us from considering the facts and Fourth Amendment interests Smith purportedly did not identify in the proceedings before the district court. And once these facts and rights are disregarded, the dissent maintains that we must conclude that the State has satisfied its burden of justifying the warrantless seizure.

---

[5] But note that the priority of the officers' motives in effectuating the stop is irrelevant. Fourth Amendment jurisprudence holds that "subjective intentions [of the officers] play no role in ordinary . . . Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). The proper inquiry is whether the officers were acting reasonably within their community caretaking scope. They were not.

¶34 Nevertheless, the dissent's opinion misapprehends the Fourth Amendment burden-shifting paradigm applicable to warrantless seizures, *see supra* ¶¶ 11–12, and it contravenes recent case law from this court, as well as binding precedent from the United States Supreme Court. Moreover, the dissent erroneously characterizes the facts and issues that have been preserved on the record before us. And it is only through this faulty characterization of both the law and the facts that the dissent is able to come to its erroneous conclusion that the State has sufficiently justified its warrantless seizure of Smith.

¶35 When filing a motion to suppress, a defendant is not required to challenge every specific detail of a warrantless search or seizure—nor is a defendant required to identify *which* Fourth Amendment interests the defendant believes the government intruded. *See supra* ¶¶ 11–12. While it is true that a defendant moving to suppress evidence bears an "initial burden of production," *State v. Worwood*, 2007 UT 47, ¶ 39, 164 P.3d 397, and must identify the "particular ground for suppressing unlawfully obtained evidence," *State v. Carter*, 707 P.2d 656, 660 (Utah 1985), this burden is minimal in the context of a warrantless search or seizure. A defendant satisfies their burden of production by proving merely that a search or seizure occurred without a warrant; then, the burden shifts to the government to justify the warrantless intrusion. *See Worwood*, 2007 UT 47, ¶ 39 n.50 (explaining that "if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search" (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir.1977)); *see also United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994) (suggesting by example that a defendant would meet their burden of production by showing merely "the point at which he or his luggage was 'seized'"). And as we explained in *Worwood*, the State's burden of proof for establishing the reasonableness of a warrantless search or seizure "is not contingent on what specific evidence is challenged in a defendant's suppression motion." 2007 UT 47, ¶ 40. Indeed, "a dearth of evidence" produced by a defendant "cannot be assumed to support the reasonableness of an officer's actions" during a warrantless

search or seizure. *Id.* "Such an assumption turns th[e] well-established proof requirement on its head."[6] *Id.*

---

[6] It is befuddling that the dissent repeatedly cites to *Worwood* to support its position that a defendant bears the burden of identifying all objectionable aspects of a warrantless search or seizure, including the specific Fourth Amendment interests the defendant believes the government has violated. *See infra* ¶¶ 45, 52, 53–54, 56, 56 n.16, 60 n.19, 68, 69, 73. To reach this conclusion, the dissent relies on a single phrase from *Worwood*, which states that a defendant must identify "how law enforcement's action infringed the Fourth Amendment." *See infra* ¶ 52 (quoting *Worwood*, 2007 UT 47, ¶ 39). However, the dissent ignores the remainder of the *Worwood* opinion—including its statement that a defendant satisfies this burden by "produc[ing] evidence that he was arrested or subjected to a search without a warrant." *See Worwood*, 2007 UT 47, ¶ 39 n. 50 (quoting *de la Fuente*, 548 F.2d at 533).

Indeed, the dissent echoes many of the same arguments raised by the *dissenting* opinion in *Worwood*. The dissent in *Worwood* argued that the defendant's motion to suppress was inadequate because it referenced "unspecified and unidentified violations of the Fourth Amendment" and did not challenge the police's "actions and their reasonableness," the "degree" of the defendant's seizure, or the "objective facts surrounding" the seizure that the defendant believed were "inadequate as a matter of constitutional law." *See Worwood*, 2007 UT 47, ¶¶55–56 (Wilkins, A.C.J., dissenting). The majority in *Worwood* rejected all these arguments, explaining that the State's burden of justifying its warrantless action is not "contingent on what specific evidence is challenged in a defendant's suppression motion" and that "a dearth of evidence cannot be assumed to support the reasonableness of an officer's actions during a[] [warrantless] investigative detention." *Id.* ¶ 40. And as we have reiterated again today, the majority in *Worwood* explained that the dissent's opinion improperly "turns th[e] well-established proof requirement on its head." *Id.*

Far from "eviscerat[ing]" *Worwood, see infra* ¶ 56 n.16, we are upholding the integrity of its holding in light of the clear constitutional requirement that the State has the burden of justifying warrantless searches and seizures. The dissent concedes that the *Worwood* opinion holds that the State's burden of proof "'is not contingent on what specific evidence is challenged in a defendant's

(continued …)

¶36 The State may rebut the presumption that a warrantless search or seizure is unreasonable by appealing to an applicable exception to the Fourth Amendment's warrant requirement. But in order to meet this burden, the State must prove that the exception *actually applies* to the facts of the search or seizure.[7] The dissent

---

suppression motion.'" *Infra* ¶ 56 n.16. The dissent likewise concedes that a court cannot take a "'dearth of evidence' from the defendant . . . [as] a basis for a decision against him." *Infra* ¶ 56 n.16. But the dissent is doing just that in its opinion when it refuses to consider "elements of police procedure" that "Smith failed to challenge," such as the police's "use of 'guns and badges' or a spotlight.'" *See infra* ¶ 92. Clearly, it is the dissent that is "eviscerat[ing]" and "rewrit[ing]" the *Worwood* opinion, not us.

[7] The dissent contends that if a defendant "assert[s] only that the search or seizure was effected without a warrant . . . the State then bears the burden . . . of identifying and establishing a basis for an exception to the requirement of a warrant." *See infra* ¶ 54. And in "establishing a basis for an exception" the dissent argues that the State does not have "the obligation of justifying any and all aspects of police activity that could affect the reasonableness of the scope or length of a search or seizure." *Infra* ¶¶ 54–55. But our law is clear: "if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government *to justify* the warrantless arrest or search." *Worwood*, 2007 UT 47, ¶ 39 n.50 (emphasis added) (quoting *de la Fuente*, 548 F.2d 528 at 533). To *justify* a warrantless search or seizure, the State must prove that the intrusion  was reasonable, and "[t]o be reasonable, a search [or seizure] must be (1) 'lawful at its inception,' *and* (2) 'executed in a reasonable manner'." *State v. Evans*, 2021 UT 63, ¶ 25, 500 P.3d 811 (emphasis added) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005)). What the dissent misunderstands is that the exceptions to the Fourth Amendment warrant requirement incorporate *both* of these reasonableness prongs into their standards. This is why *Anderson* requires courts to analyze "the degree to which an officer intrudes upon a citizen's freedom of movement and privacy" including "the degree of overt authority and force displayed in effecting the seizure," as well as "the length of the seizure" when determining whether the State has met its burden to prove that the community caretaking exception applies. *Anderson*, 2015 UT 90, ¶ 26 (internal

(continued …)

argues that the State did not have to justify the scope or invasiveness of its warrantless seizure of Smith because Smith challenged only the "threshold basis" for his seizure in his motion to suppress. However, this argument flips the Fourth Amendment burden-shifting paradigm on its head. The *State* has the burden of proving that its warrantless seizure of Smith was reasonable, and the reasonableness of all searches and seizures under the Fourth Amendment must be "measured in objective terms by examining the *totality* of the circumstances, *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (emphasis added), not just by examining discrete facts that may have been mentioned in a motion to suppress. Indeed, as the Supreme Court has explained, "[t]he scope of the search [or seizure] must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19 (citation omitted). This is because "[t]he manner in which the seizure and search were conducted is . . . as vital a part of the inquiry as whether they were warranted at all."[8] *Id.* at 28.

---

quotation marks omitted) (citation omitted). If the State does not want to engage in the exercise, then it can get a warrant. *Cf. Missouri v. McNeely*, 569 U.S. 141, 172-73 (2013) (Roberts, C.J., concurring) ("[P]olice can often request warrants rather quickly these days. . . . Utah has an e-warrant procedure where a police officer enters information into a system, the system notifies a prosecutor, and upon approval the officer forwards the information to a magistrate, who can electronically return a warrant to the officer. Judges have been known to issue warrants in as little as five minutes." (citations omitted)).

[8] The dissent cites to three cases from this court as support for its position that "a challenge to the *threshold basis* for a given search or seizure is insufficient to preserve a challenge to its *scope or length of time*." *See infra* ¶¶ 58–59 (citing *State v. Constantino*, 732 P.2d 125, 226 (Utah 1987) (per curiam); *State v. Carter*, 707 P.2d 656, 661 (Utah 1985); and *State v. Lee*, 633 P.2d 48, 52 (Utah 1985)). However, all three of these cases are inapposite. In *Lee* and *Carter*, we declined to analyze the reasonableness of the scopes of certain searches and seizures because the defendants did not initially argue that those searches and seizures were improper because they were conducted without a warrant. *See Lee* 633 P.2d at 52 ("The asserted illegality of the seizure because of the failure of [the police officer] to obtain a

(continued …)

¶37   Smith met his threshold burden of production by showing that he had been seized and subsequently searched without a warrant. The burden then shifted to the State to prove that the seizure and subsequent searches were reasonable. The State sought to meet this burden based solely on the community caretaking exception. In *Anderson*, we held that when analyzing whether the community caretaking exception justifies a warrantless seizure, "courts must first evaluate the degree to which an officer intrudes upon a citizen's freedom of movement and privacy" including "the degree of overt authority and force displayed in effecting the seizure," as well as "the length of the seizure." 2015 UT 90, ¶ 26 (internal quotation marks omitted) (citation omitted). While the dissent argues that the "*Anderson* standard is not a laundry list of Fourth Amendment considerations that must be assessed and balanced in every case," *infra* ¶ 67, the plain language of our holding begs to differ.[9] We most certainly did not, under *Anderson*, limit the

---

warrant was not argued at the hearing on the motion to suppress, and the trial court did not address the issue which defendant now seeks to raise."); *Carter*, 707 P.2d at 661 ("Defendant never did contend that the police required a warrant to search the backpack irrespective of the lawfulness of the stop and frisk issue."). Here, Smith clearly alleged in his motion to suppress that his "initial seizure . . . and also the searches that followed were conducted without a valid search warrant." And in *Constantino*, the issue we declined to address on appeal concerned a challenge to an inventory search of an impounded vehicle, not the scope of a warrantless search or seizure. *See* 732 P.2d at 126. As we have explained elsewhere, "inventory searches are not per se unreasonable within the meaning of the fourth amendment and article I, section 14" of the Utah Constitution because they "do not implicate 'the interests which are protected when searches are conditioned on warrants.'" *State v. Hygh*, 711 P.2d 264, 267 (Utah 1985) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 382-83 (1976) (Powell, J., concurring)).

[9] The dissent mischaracterizes *Anderson*, describing the holding as stating that "a court *may* evaluate whether a 'community caretaking stop' 'intrudes upon a citizen's freedom of movement and privacy'." *Infra* ¶ 97 (emphasis added) (quoting *Anderson*, 2015 UT 90, ¶ 26). The actual quote from *Anderson* uses the word "must," not "may." *See* 2015 UT 90, ¶ 26 ("[C]ourts *must* first evaluate the degree

(continued …)

Fourth Amendment considerations to only those identified by the defendant. Instead, we held clearly that courts must balance *both* the defendant's freedom of movement and right to privacy against the government's interest in the seizure. And in doing so, we explained that courts must grapple with all details of the intrusion—including the scope, the length, the invasiveness, and the overt authority and force displayed.[10] As such, it is not only proper but necessary for us to consider all aspects of the police's search and seizure of Smith—including the use of multiple officers, guns, badges, and a spotlight.[11]

---

to which an officer intrudes upon a citizen's freedom of movement and privacy." (emphasis added)).

[10] The dissent also objects to our consideration of facts relevant to the overt display of authority and power used by the police officers in their seizure of Smith on the separate ground that "there is no Fourth Amendment right to be free from a 'significant' show of 'force' or 'authority' or to use methods of gaining an 'advantage over' others." *Infra* ¶ 99. The dissent does not cite to any case establishing this artificial limitation on the Fourth Amendment, and we question its accuracy. *See Graham v. Connor*, 490 U.S. 386, 395 ("[T]he 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out." (citation omitted)). However, whether these interests are, in fact, cognizable under the Fourth Amendment is ultimately irrelevant. We do not rely on these factual considerations to conclude that the State violated yet another constitutional right of Smith. Instead, we rely on these facts because the *Anderson* standard *compels* us to consider "the degree of overt authority and force displayed" in a seizure to determine whether the objective facts demonstrate that the State was exercising its legitimate interest in community caretaking. *See Anderson*, 2015 UT 90, ¶ 26 (citation omitted).

[11] The dissent claims that our holding forces the State to be "clairvoyan[t]," to guess at which arguments a defendant will make and respond to them. *Infra* ¶ 60. This is incorrect. Our opinion does not demand clairvoyance from the State—it reaffirms our holding in *Anderson* and explains that in order to show that the community caretaking exception applies, the State must show that the invasiveness of the stop or seizure and the perceived need for aid,

(continued …)

¶38   In any event, we take issue with the dissent's description of Smith's motion to suppress, and in particular, the dissent's contention that Smith "asserted only that the police lacked a threshold justification for a seizure," *infra* ¶ 47, and that Smith "nowhere alleged that the police had effected an unreasonable 'search' or invaded a right of 'privacy'." *Infra* ¶ 98. Smith's motion to suppress repeatedly and explicitly challenged not just his warrantless seizure but also the subsequent searches of his person and vehicle.[12] Smith alleged that the "initial seizure . . . *and also the searches that followed* were conducted without a valid search warrant, and without any applicable exception to the warrant requirement of the Utah and U.S. Constitutions."(Emphasis added.) Smith explained that a police officer "entered [his] vehicle upon first approach of the car . . . [and] *conducted an illegal search* without an exception to the warrant requirement."(Emphasis added.) And Smith alleged further that "when the officers ordered Mr. Smith to open his car door, they conducted a further seizure *and search* of Mr. Smith and his vehicle." (Emphasis added.) While the dissent criticizes Smith for not explicitly referencing his "right to privacy" under the Fourth Amendment, "[w]hether a party has properly preserved an argument . . . cannot turn on the use of magic words or phrases." *Salt Lake City v. Josephson,* 2019 UT 6, ¶ 12 n.12, 435 P.3d 255 (alterations

---

when balanced together, make the stop reasonable. By choosing the community caretaking exception, the State knows exactly, from *Anderson,* what arguments it will be expected to make and what analysis the court will engage in. Indeed, in its response to Smith's motion to suppress, the State laid out this analysis.

[12] We reiterate, however, that even if Smith had challenged only the threshold justification for his seizure (implicating only Smith's freedom of movement), the State would still have the burden of proving this intrusion was justified. And at the risk of sounding like a broken record, if the state chooses to prove justification by arguing that the community caretaking exception applied, then it must, under *Anderson,* grapple with the details of the seizure—including the scope, the length, the invasiveness, and any overt means used. 2015 UT 90, ¶ 26; *see also supra* ¶¶ 16–18, 37. In other words, this analysis is, under *Anderson,* the proper analysis to decide whether there was a justification for a seizure (i.e., whether the community caretaking exception applies).

in original) (quoting *In re Baby Girl T.*, 2012 UT 78, ¶ 38, 298 P.3d 1251).

¶39   Any reasonable jurist or party would understand that Smith's repeated objections to the police's improper searches of his vehicle and person implicated not just Smith's "freedom of movement" under the Fourth Amendment but also his "right to privacy." In fact, the State cited to *Anderson* in its response to Smith's motion to suppress and argued that the district court's analysis of the seizure must include an evaluation of "the degree to which an officer intrudes upon a citizen's freedom of movement *and privacy*." (Emphasis added.) And in its Findings of Fact and Conclusions of Law on Smith's motion to suppress, the district court likewise understood that it needed to balance the State's interest in the public welfare against "Smith's freedom of movement *and privacy*."(Emphasis added.) In other words, despite the dissent's attempt to manufacture confusion, the record shows definitively that both the State and district court understood that Smith's right to privacy was at issue in this case.

¶40   We also take issue with the dissent's characterization that certain facts, such as the police's "use of a spotlight, and the display of guns and badges by multiple officers," "were never raised in the district court." *See infra* ¶ 76. The district court referenced each of these facts in its Findings of Facts and Conclusions of Law, and they were all raised in the evidentiary hearing regarding Smith's motion to suppress. As such, it is proper for us to consider these facts on appeal even under the dissent's theory that Smith bore the burden of producing all facts in the district court.

¶41   Finally, the dissent's opinion distorts our preservation rules on what needs to be preserved and what does not. Our preservation rules require that *issues* be preserved, but "new arguments, when brought under a properly preserved issue or theory," raise no concerns. *See State v. Johnson*, 2017 UT 76, ¶ 14 n.2, 416 P.3d 443 (emphasis omitted). The State conceded, and the district court found, that Smith had been seized without a warrant, making the seizure presumptively unreasonable. *See supra* ¶ 11. The State tried to justify the seizure by pointing to the community caretaking exception, which requires a factual analysis of the invasiveness of the seizure. Smith, in turn, addressed the State's arguments in his reply. There is no issue with Smith relying on "new authority relevant to" an issue that has "properly been preserved on appeal"—namely, whether his seizure and subsequent searches were reasonable. *See Patterson v. Patterson*, 2011 UT 68, ¶ 18, 266 P.3d 828. This is especially true given

the State's burden to justify the warrantless seizure under an applicable exception. *See supra* ¶¶ 11–12, 35-36.

¶42   And even if we accepted the dissent's basic premise that Smith failed to preserve certain issues related to the scope or invasiveness of his seizure, we would be well within our discretion to decide these unpreserved matters. *See, e.g., Patterson,* 2011 UT 68, ¶ 17. This is especially the case when the district court itself reached, and thus preserved, the argument (as the district court in this case did by applying the first prong of *Anderson*). *See, e.g., Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare,* 2016 UT 28, ¶ 13, 379 P.3d 1218. Moreover, the State has not argued preservation or urged us to find these arguments unpreserved. *Cf. Johnson,* 2017 UT 76, ¶ 17 n.5. Indeed, "[t]hroughout its opposition to [Smith's] suppression motion, the State never argued that [Smith's] federal [or state] challenge was vague, incomplete, or lacking requisite specificity." *Worwood,* 2007 UT 47, ¶ 38. While we can, of course, choose to bring up preservation issues *sua sponte,* "the State's failure to make the [preservation] argument" meant that Smith "could not address the argument in his reply." *State v. Malo,* 2020 UT 42, ¶ 20 n.7, 469 P.3d 982. We have said before that "such failure could mean we would decide to address the matter on appeal despite the lack of preservation." *Id.*[13] And in a case such as this—where a defendant's Fourth Amendment rights are at stake—it would be improper and callous for us to raise a preservation issue *sua sponte* in order to justify the police's warrantless search and seizure of a private citizen.

¶43   Only by excluding several of the most objectionable facts in the police's seizure and subsequent searches of Smith is the dissent able to conclude that the State has met its burden of justifying the seizure under the community caretaking exception. *See infra* ¶ 96 (refusing to consider the "length of the seizure, the "'overt' 'display' or show of authority," the "use of a spotlight to 'gain an advantage,'" or the "aspects of police conduct that may seem to amount to 'an annoying, frightening, and perhaps humiliating experience'"). In so doing, the dissent is able to show that a *hypothetical* seizure of Smith could have been justified under the law. But we have not been asked

---

[13] Of course, given our holding and disagreement with the dissent, we do not actually fault the State for not arguing preservation in this case. Such an argument would have been improper because it would have contravened clearly established Fourth Amendment jurisprudence. *See supra* ¶¶ 35–37.

to pass judgment on a hypothetical; we have been asked to analyze the reasonableness of the search and seizure of Smith that actually occurred. And we are bound by precedent from this court and the United States Supreme Court, which dictates that the burden of justifying a warrantless search or seizure falls squarely on the State and that courts must review the reasonableness of such intrusions under the totality of the circumstances.

## CONCLUSION

¶44 Once a defendant has sufficiently raised a Fourth Amendment challenge—for example, by establishing he was seized without a warrant—the onus is squarely on the State to show that the seizure was nonetheless lawful. Here, the State failed to show that the facts alleged support application of the community caretaking exception. Rather, the facts indicate that the police's seizure of Smith was incommensurate with either Smith's minimal need for assistance or the low risk to the community of an impaired driver on the road. As such, we reverse the court of appeals and grant Smith's motion to suppress.

———————

ASSOCIATE CHIEF JUSTICE LEE, dissenting:

¶45 For decades, our case law has required a defendant to identify the "particular ground[s] for suppressing unlawfully obtained evidence in the trial court." *State v. Carter*, 707 P.2d 656, 660 (Utah 1985). This is a threshold "burden of production" for a party alleging a violation of the Fourth Amendment. *State v. Worwood*, 2007 UT 47, ¶ 39, 164 P.3d 397. To carry this burden, a defendant must indicate "how law enforcement's action infringed the Fourth Amendment"—by specifying elements of police procedure under challenge, and identifying a constitutional interest as a basis for challenging them. *Id.*

¶46 This burden is erased by today's majority. The court now requires only a bare allegation that a "search or seizure was conducted without a warrant." *Supra* ¶ 11. Once this allegation is made, the majority requires the prosecution to justify the reasonableness of any and all elements of a police encounter with the defendant—whether or not the defendant has objected to them. *See supra* ¶ 35. And every reviewing court must assess the reasonableness of the "totality" of the encounter without any limitation to the challenges or Fourth Amendment interests raised by the defense or addressed on the record in the district court.[14] *See supra* ¶ 18 n.2.

¶47 Brett Smith advanced a limited basis for his motion to suppress in the proceedings in the district court. He asserted only that the police lacked a threshold justification for a seizure—he made no challenge to the seizure's length or scope. And he identified only one interest that was implicated under the Fourth Amendment—the right to freedom of movement. Yet the majority sweeps much more broadly. It questions elements of the police encounter (like the call

---

[14] Under the majority's framework, the defendant is entitled to an independent assessment of the reasonableness of all elements of a police encounter at each new stage of judicial review—in the district court, the court of appeals, and the supreme court. At each stage, our judges are to look beyond the specific aspects of police practice challenged by the defendant. And they are to think expansively about Fourth Amendment interests that might conceivably be implicated, without any restriction to the points developed on the district court record. Perhaps this will be a boon to the work of defense counsel. But it will surely be a detriment to the rule of law.

for backup and the use of a spotlight) of relevance to its length or scope. And it raises Fourth Amendment interests (like a right to privacy) that have nothing to do with the freedom of movement. None of these considerations were raised by Smith or addressed by the district court. And none of them are proper grounds for reversal of the denial of Smith's motion to suppress.

¶48 The State, of course, bears a burden of identifying and establishing a basis for an exception to the requirement of a warrant. *See supra* ¶ 11. But the State's burden is framed and limited by the defendant's allegations under the threshold burden of production. And the State carried its burden by establishing a justification for the seizure under the community caretaking doctrine—a need to check on a motorist who was slumped over the wheel of a car parked in a McDonald's parking lot in the middle of the night.

¶49 The State bore no burden of anticipating and addressing unchallenged elements of the police encounter in question. And it had no obligation to identify and rebut the basis for additional rights or interests that conceivably could have been raised under the Fourth Amendment.

¶50 I respectfully dissent from the court's contrary conclusions. I develop the basis for my position in greater detail below. First, I present the extensive body of case law establishing a defendant's burden of production or preservation. Second, I highlight the narrow basis for the motion advanced by Smith in the district court. Third, I demonstrate that Smith's motion was rightly denied in light of the narrow basis for his motion to suppress. On each point, I respond to counterarguments from the majority and show that its position is incompatible with our settled precedent and inconsistent with our system of orderly judicial review. And I close with some observations about the confusion and difficulty that will ensue from today's decision.

I

¶51 A defendant "is not obligated, in the first instance, to prove that a warrantless search or seizure was unlawful." *Supra* ¶ 11. But he is obligated to carry a threshold burden of production—in identifying the challenged elements of a search or seizure, and alleging a specific right allegedly infringed thereby.

¶52 To carry the burden of production, the defendant must specify "how law enforcement's action infringed the Fourth Amendment." *State v. Worwood*, 2007 UT 47, ¶ 39, 161 P.3d 397. He must identify the nature and extent to which his "own Fourth

Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). And he must allege "facts" that inform the prosecution as to the nature of his claim. *See Worwood*, 2007 UT 47, ¶ 37.

¶53 Our cases identify two categories of claims that may be raised in a motion to suppress: (1) an allegation that the police "lacked sufficient objective facts" to establish a *threshold basis* for a given search or seizure; and (2) a challenge to elements of a search or seizure that render it "unreasonable as to *scope [or] length of time.*" *Id.* (emphasis added); *see also State v. Evans*, 2021 UT 63, ¶ 26, 500 P.3d 811 (noting that a search may be challenged as either unlawful "at its inception" or as "executed in a[n] [un]reasonable manner" (quoting *Illinois v. Caballes*, 543 U.S. 405, 407–08 (2005))).[15]

¶54 The extent of the defendant's burden of production will vary with the nature of the claim at issue. If the defendant is challenging only the threshold basis for a given search or seizure, he may carry the burden of production by asserting only that the search or seizure was effected without a warrant. *See supra* ¶ 11 (citing *Worwood*, 2007 UT 47, ¶ 39 n.50). And if the defendant advances such a claim, the State then bears the burden of rebutting it—of identifying and establishing a basis for an exception to the requirement of a warrant. *See State v. Christensen*, 676 P.2d 408, 412 (Utah 1984) (stating that the State must provide "evidence showing an exception to the warrant requirement")

¶55 The State bears no further burden in the face of such a limited showing by the defendant, however. A bare allegation of a warrantless search or seizure has never been held to shift to the State the obligation of justifying any and all aspects of police activity that could affect the reasonableness of the scope or length of a search or seizure. If the defendant challenges only the basis for a search or seizure, the State is obligated only to establish a basis for the police encounter. It is not required to also justify other matters going to scope and length.

---

[15] The Fourth Amendment analysis admittedly can encompass "*both* of these reasonableness prongs into their standards." *Supra* ¶ 36 n.7. But the availability of both categories of claims has never been understood as a mandate that a court consider them regardless of whether they have been put at issue by the defendant.

Lee, A.C.J., dissenting

¶56 Under *Worwood*, the burden shifts to the State to establish "the reasonableness of law enforcement's action[s]." *Worwood*, 2007 UT 47, ¶ 39. But the State is not and cannot be expected to justify "action[s]" not identified by the movant as a basis for the motion to suppress. The State's burden is invoked only after the movant "adequately challenges a warrantless [search or] seizure" by carrying the threshold burden of production.[16] *Id.*

---

[16] The majority purports to retain the central tenets of *Worwood*, quoting it for the proposition that the defendant bears an "initial burden of production." *See supra* ¶ 35. It likewise acknowledges the standard in *State v. Carter*, noting that the defendant "must identify the 'particular ground for suppressing unlawfully obtained evidence.'" *See supra* ¶ 35. But it then pivots to a point that eviscerates the quoted standard—in its assertion that the defendant's "burden is minimal" and is satisfied by the bare assertion "that a search or seizure occurred without a warrant." *Supra* ¶ 35. This is a rewrite and an override of *Worwood*. *Worwood* nowhere states that the mere mention of a lack of a warrant is a basis for a sweeping, untethered inquiry into the totality of a police encounter. Under *Worwood*, the defendant is to allege "facts" that show "how law enforcement's action infringed the Fourth Amendment," either by asserting that a given search or seizure lacked a threshold basis or by alleging that it was "unreasonable as to scope [or] length of time." *See* 2007 UT 47, ¶¶ 37, 39. And the prosecution's burden of proof is commensurate with the defendant's allegations. *See id.* ¶ 39 (stating that the prosecution's burden of proof arises after the defendant "adequately challenges" police practice). This is not an isolated, "single phrase from *Worwood*." *Supra* ¶ 35 n.6. It is a clear statement of the court's description of the defendant's burden of production.

The defendant in *Worwood* carried his burden not by a bare allusion to a lack of a warrant but by specifically "challeng[ing]" both "the constitutionality of [an] initial stop" by the police and asserting that "the scope of the stop" had been extended beyond the scope necessitated by its purpose. 2007 UT 47, ¶ 39. Worwood identified the specific constitutional right he was asserting—an infringement of the standards set forth in Fourth Amendment case law on the permissible basis for and scope of an "investigative detention." *Id.* ¶ 22. And he "support[ed]" his "challenge with factual references." *Id.* ¶ 39. The prosecution's burden of proof was dictated by—and commensurate with—these assertions.

(continued …)

LEE, A.C.J., dissenting

¶57 This is a well-settled premise of our case law. As we noted in *State v. Evans*, "the government 'bears the burden of proving that its warrantless actions were justified,'" 2021 UT 63, ¶ 26 (citation omitted), "*[w]hen*" the defendant raises a "challenge[]," *id.* (emphasis added), that a given police encounter is (1) unlawful "at its inception" or (2) not "executed in a reasonable manner," *id.* (citing *Caballes*, 543 U.S. at 407–08). "When" is the operative term. It makes clear that the State's burden of proof is defined by—and commensurate with—the defendant's burden of production.[17]

¶58 We have reinforced this principle elsewhere. In *State v. Carter*, we held that a defendant must articulate the "particular ground[s] for suppressing unlawfully obtained evidence in the trial

---

The *Worwood* opinion does observe that the State's burden of proof "is not contingent on what specific evidence is challenged in a defendant's suppression motion." *Id.* ¶ 40; *supra* ¶ 35. And it concludes that "'a dearth of evidence' produced by a defendant 'cannot be assumed to support the reasonableness of an officer's actions' during a warrantless search or seizure." *Supra* ¶ 35 (citing *Worwood*, 2007 UT 47, ¶ 40). But this is just a reflection of the nature and effect of the State's burden of proof. If the defendant challenges the threshold basis for a search or seizure by citing the lack of a warrant, the burden shifts to the State to establish a basis for an exception to the warrant requirement. And because the State bears that burden, a "dearth of evidence" from the defendant is not a basis for a decision against him.

None of this speaks to the question presented here. Nothing in *Worwood* says that the bare mention of a lack of a warrant opens the door to a totality of the circumstances review of the reasonableness of the scope or length of a police encounter.

The majority's contrary conclusions are rooted in a misstatement of my position. I am not suggesting that "a 'dearth of evidence' from the defendant" is a "basis for a decision against him." *Supra* ¶ 35 n.6. I am noting that the State's burden of proof is informed by and commensurate with the points raised by the defendant under his burden of production.

[17] This does not "flip[] the Fourth Amendment burden-shifting paradigm on its head." *Supra* ¶ 36. It aligns the State's burden of proof with the claims preserved by the defendant under the burden of production.

court." 707 P.2d at 660. And in *State v. Constantino*, we specifically held that a challenge to the *threshold basis* for a given search or seizure is insufficient to preserve a challenge to its *scope or length of time*. 732 P.2d 125, 126 (Utah 1987) (per curiam) (holding that defendant had failed to preserve a challenge to the scope of a search as "a 'pretext inventory search'" where the issue was "first raised on appeal" and the defendant had asserted below only "whether the stop of his vehicle and the resulting search were valid"); *see also State v. Lee*, 633 P.2d 48, 52 (Utah 1981) (concluding that defendant had failed to preserve the allegation that a "warrantless seizure of . . . stolen articles was unconstitutional" where "the sole contention argued on the motion to suppress in the trial court, and in the supporting memorandum, was that the initial viewing of the contents of the defendant's truck was an illegal search and that therefore the items were tainted as fruit of the poisonous tree and suppressible").[18]

¶59 This is reinforced by the central tenets of our law of preservation. As a general rule, a party may not raise a claim or issue on appeal unless he has preserved the matter in the district court in a manner that gives his opponent a chance to respond to it and the lower court "an opportunity to rule on it" and "correct it" if appropriate. *State v. Johnson*, 2017 UT 76, ¶¶ 15, 30, 416 P.3d 443 (citation omitted). This is a matter of "judicial economy and fairness" to the parties and the lower courts. *Id.* An appellant is in no position to raise a new claim on appeal, particularly on a point that could have led to the development of a "factual predicate[]" of relevance to the disposition of the issue. *Patterson v. Patterson*, 2011 UT 68, ¶ 15, 266 P.3d 828. And an appellate court is in no position to reverse on such a ground where it was not preserved in the district court. Such a decision disrupts the efficient operation of our courts and undermines the reliance interests of the party who prevailed below.

---

[18] Admittedly, the defendants in *Lee* and *Carter* "did not initially argue" that the search or seizure in those cases was "improper" because it was "conducted without a warrant." *Supra* ¶ 36 n.8 (citing *Lee*, 633 P.2d at 52; *Carter*, 707 P.2d at 661). But that does not render these cases "inapposite." *Id.* They reinforce a core premise that is embedded in our case law but abandoned by the court today—the requirement that the defendant carry a threshold burden of production by identifying the grounds for a motion to suppress.

LEE, A.C.J., dissenting

¶60 The law does not compel clairvoyance[19] in a response to a motion to suppress. The State is entitled to focus on the specific

---

[19] A moving party is not required to anticipate the exception the State may rely on—it is the State's responsibility to identify an exception to the warrant requirement that it intends to rely on. The moving party, however, always bears the threshold burden of production—the burden of identifying the Fourth Amendment interest that allegedly was infringed by police activity. *See Worwood*, 2007 UT 47, ¶ 39(emphasizing that a defendant must "articulate *how* law enforcement's action infringed the Fourth Amendment"(emphasis added)). That burden may be carried by an assertion that there was a "seizure" infringing on the right to freedom of movement or a "search" infringing on a right of privacy. In asserting that one or both of these interests was infringed, a defendant may challenge the *threshold basis* for the seizure or search or assert that it was unreasonable in its *length* or *scope*. *See id.* ¶ 37. But the "particular ground[s]" for a claim of infringement are elements that must be preserved by the defendant. *See Carter*, 707 P.2d at 660. They are not grounds that our law requires the State to anticipate and rebut in a sweeping fashion, on the off chance that they may fall within the scope of a claim that could conceivably be asserted.

The problem is not averted by the general catalog of potentially relevant considerations set forth in *Anderson*. *See supra* ¶ 37 n.10. *Anderson* does not tell the prosecution "what arguments it will be expected to make and what analysis the court will engage in." *Supra* ¶ 37 n.11. It simply identifies broad categories of interests and intrusions that the defendant may arise. And it leaves unanswered a broad range of questions as to how these categories may map onto an individual case. Under *Anderson*, it can be said that "the degree of overt authority and force displayed," *State v. Anderson*, 2015 UT 90, ¶ 26, 362 P.3d 1232 (citation omitted) may be considered, along with "the length of the seizure," *id.* But *Anderson* does not tell the prosecution what aspect of police practice might be challenged as exceeding the bounds of the permissible "force" or "authority." Is the prosecution required to inquire into the tone or volume of the voice used by the police in their encounter? Must it consider their physique or posture, or the words they use in confronting the defendant? These and other questions are not answered by *Anderson*. They are teed up by the defendant in his motion to suppress.

(continued …)

grounds articulated by the defendant, and is required to respond only to those grounds. "[W]here a defendant fails to assert a particular ground for suppressing unlawfully obtained evidence in the trial court, an appellate court will not consider that ground on appeal." *Constantino*, 732 P.2d at 126 (citation omitted). Put another way, the defendant's burden of preservation is present, in part, so that the State need not bear the burden of prophecy.

¶61 The majority asserts three sets of challenges to this framework. All of them fall short.

### A

¶62 The majority first responds by insisting that a defendant's only burden is to assert that "he had been seized. . . without a warrant." *Supra* ¶ 12. It warns that a defendant cannot be expected to guess which exception to the warrant requirement the government may seek to rely on. And it cites cases holding that the State bears the burden of both identifying an exception and establishing a basis for its application in a particular case. *See supra* ¶ 11.

¶63 The majority's premise is correct as far as it goes. The defendant is not required to anticipate the State's litigation strategy (in identifying an exception to the warrant requirement). And the State bears the ultimate burden of establishing a basis for invoking and applying any alleged exception.

¶64 The State's burden is framed, however, by the Fourth Amendment claims asserted by the defendant under its burden of production. This is not a freewheeling inquiry into the reasonableness of any elements of a police encounter that might conceivably stand in need of justification. It is an assessment framed by the moving party's burden of production—in identifying elements of the police encounter under challenge, and asserting Fourth Amendment interests that are infringed. If a defendant has not taken issue with certain aspects of a police encounter, the State is not obligated to justify them. And if a defendant has not a asserted a

---

The universe of possible claims does not stop with the considerations set forth in *Anderson*. Under the majority opinion, the "totality of the circumstances" is always in play. And the prosecution must anticipate and respond to any and all concerns that might occur to any judge at any stage of the judicial inquiry. This is not our law. Or at least it was not until today.

particular Fourth Amendment interest, the State need not account for a supposed infringement of that interest.

¶65 If and where a defendant alleges that "the scope, the length, [or] the invasiveness" of an element of police activity, *supra* ¶ 37, infringed a protected interest under the Fourth Amendment, the State bears the burden of establishing a reasonable justification for that infringement under *Anderson*.[20] But the majority's cases don't override or reformulate our law of preservation. They don't erase the defendant's burden of production. And they don't require the State to present evidence justifying intrusions on interests that have not been alleged to have been infringed by the defendant.

B

¶66 The majority next responds by invoking the community caretaking standard set forth in *Anderson*. It notes that *Anderson* calls for a "balancing" of a wide range of interests that encompass any and all "details" of a police encounter—"including the scope, the length, the invasiveness, and [any overt means used]" by the State. *Supra* ¶ 37 & n.7. And it contends that the defendant's assertion of a warrantless seizure required the State to address—and the district court to balance—each of these considerations, regardless of whether the defendant challenged those aspects of the police encounter as an infringement of his Fourth Amendment rights.

¶67 But *Anderson* does not support the majority's decision. The *Anderson* standard is not a laundry list of Fourth Amendment considerations that must be assessed and balanced in every case. It is a catalog of constitutional considerations that may be raised by a claimant. Whether such considerations are, in fact, implicated is a matter to be developed through the law of preservation and the defendant's burden of production in any individual case.

¶68 *Anderson* does not speak to the defendant's burden of production. It does not cite *Worwood* or *Carter* or any of the other controlling cases. And it cannot properly be read to have silently overruled them.

---

[20] The State bears the burden of establishing the basis for application of this exception to the warrant rule. What it does not bear is the burden imposed on it by the majority—of anticipating the nature and degree of an intrusion on a Fourth Amendment interest that has not been alleged by the defendant.

¶69 *Anderson* did not overrule the *Worwood* requirement that the defendant "articulate *how* law enforcement's action infringed the Fourth Amendment," *Worwood,* 2007 UT 47, ¶ 39 (emphasis added), or the *Carter* requirement that he identify the "particular ground[s]" for a constitutional claim, *Carter,* 707 P.2d at 660; *see also id.* at 661 (holding that "motions to suppress should be supported by precise averments, not conclusory allegations"). These decisions remain intact. And they can easily be read as consistent with the catalog of Fourth Amendment interests set forth in *Anderson.*[21]

C

¶70 The majority also seeks to reconcile its approach with our law of preservation. But none of its arguments holds water. And together they threaten to unravel the fabric of our law of preservation.

1

¶71 The requirement of preservation is admittedly subject to an exception allowing consideration of "new arguments" on "issues" that were preserved below. *See supra* ¶ 41. But the line between arguments and issues must be carefully cabined. *See Patterson,* 2011 UT 68, ¶ 15(noting that past cases have sometimes "conflated" the notion of "argument" and "issue" and warning that "semantics alone" cannot control). The relevant "issue" cannot be defined in a sweeping manner that allows the exception to swallow the rule.

¶72 The majority does just that. It says that the relevant "issue" is simply whether the defendant's warrantless seizure was justified. *Supra* ¶ 11. And because that issue was preserved by the defense and decided by the district court, the majority concludes that this opens the door to a "totality of the circumstances" review of any and all elements of the police encounter in question, in light of any and all interests that might come into play under the Fourth Amendment. *See supra* ¶ 18 n.2.

---

[21] The majority misses my point in asserting that *Anderson* did not "limit the Fourth Amendment considerations to only those identified by the defendant." *Supra* ¶ 37. This restriction does not appear in *Anderson* because that case did not raise the question of the nature and extent of the defendant's burden of production. And the limitation is established not by *Anderson* but by our settled case law highlighting the defendant's threshold burden of production.

LEE, A.C.J., dissenting

¶73 This is a rule-swallowing distortion. If the only "issue" to be preserved or considered is whether a seizure was justified, it can no longer be said that the defendant bears the threshold burden of identifying the "particular ground[s]" for a claim of infringement, *Carter*, 707 P.2d at 660, or "articulat[ing] how law enforcement's action infringed the Fourth Amendment," *Worwood*, 2007 UT 47, ¶ 39, 164 P.3d 397. These cases frame the issue at the appropriate level of generality. And the majority errs in overriding them through its reductionist definition of the relevant issue.[22]

2

¶74 As the majority notes, the appellate courts retain a measure of "discretion" under the law of preservation. *Supra* ¶ 42. And in deciding how to exercise our discretion, we may consider whether and to what extent the party that prevailed below has "argued preservation or urged" the appellate court to decline to decide the case on the basis of a lack of preservation. *Id.* That is not the only factor governing the exercise of our discretion, however. And here there are important considerations that cut against the decision to resolve this case on grounds not presented or decided in the district court.

¶75 "The two primary considerations underlying" the requirement of preservation "are judicial economy and fairness." *Patterson*, 2011 UT 68, ¶ 15. And our case law has emphasized that these policies are "most directly frustrated" when an appellate court reverses on the basis of "unpreserved claims that require factual predicates." *Id.* "For this reason, the preservation rule should be more strictly applied when the asserted new issue or theory 'depends on controverted factual questions whose relevance . . . was not made to appear at trial.'" *Id.* (citation omitted); *see also Johnson*, 2017 UT 76, ¶ 45 (citing *Patterson* for this principle).

¶76 The majority faults the State for failing to justify elements of police activity that were never raised in the district court—like the call for backup, the use of a spotlight, and the display of guns and badges by multiple officers. *See supra* ¶ 28. And it reverses on the

---

[22] This case is not on par with *Patterson*. Smith is not seeking to introduce "'new authority relevant to' an issue that has 'properly been preserved on appeal.'" *Supra* ¶ 41 (citing *Patterson*, 2011 UT 68, ¶ 18). He is seeking reversal on a range of fact-intensive issues that were not presented to or decided by the district court.

ground that the missteps of the police might implicate Fourth Amendment interests or rights that were not considered—like the right to privacy. *See supra* ¶ 31. But these conclusions turn on fact-intensive questions lacking any development in the record. And it is an affront to judicial economy and fairness for this court to reverse on these grounds.

¶77 The law of preservation is a central feature of "our adversary system." *Patterson*, 2011 UT 68, ¶ 16. It recognizes that "the responsibility for detecting error is on the party asserting it, not on the court." *Id.* And it accordingly holds that it is "generally . . . unfair to reverse a district court for a reason presented first on appeal." *Id.* ¶ 16; *see also Johnson*, 2017 UT 76, ¶ 40 (reaching the same conclusion and highlighting the importance of "procedural regularity"). We may recognize an exception to this general rule where necessary to fulfill our "responsibility to maintain a sound and uniform body of precedent." *Id.* ¶ 20. But here that responsibility cuts the other way.

¶78 The court is taking the State's failure to rely on the law of preservation as a basis for reforming our law and opening the floodgates to open-ended judicial review of a motion to suppress. This is problematic. And it is not at all mandated by the discretion preserved for our courts under the law of preservation.[23]

II

¶79 Smith advanced a binary position on his motion to suppress. He challenged only the threshold justification for his seizure by the police. And he claimed only that the police "restrict[ed] his ability to leave." In other words, he identified only one Fourth Amendment interest or right that was allegedly infringed—the right to "freedom of movement." *Anderson*, 2015 UT 90, ¶ 25.

---

[23] The sweeping nature of the court's decision, moreover, exceeds and belies the majority's professed concern about the State's failure to ask us to decide this case on preservation grounds. *See supra* ¶ 42. If that were the driving concern, the majority would not be rewriting our law on the moving party's burden of production, or eviscerating it by requiring a mere mention of a lack of a warrant. It would be limiting its decision to the procedural facts of this case, and simply holding that the State forfeited any right to complain about the broad, untethered balancing and freewheeling factual inquiry that forms the basis of the court's opinion.

LEE, A.C.J., dissenting

¶80 In supporting his motion, Smith highlighted testimony indicating that "a police vehicle [had] pulled directly behind [him] and blocked [his] vehicle." And he asserted that his freedom of movement was intruded upon at that point because "the police action of blocking a vehicle would leave a reasonable person to determine he is seized and unable to leave."

¶81 The State responded by claiming that a restriction on Smith's freedom of movement was justified under the "community caretaking" doctrine as articulated in *State v. Anderson*, 2015 UT 90. It asserted that there was a substantial need to check on the defendant to see if he needed assistance or posed a danger to others, as there was in *Anderson*.

¶82 The State thus acknowledged that the police had physically blocked Smith in by parking behind him. But it insisted that the "degree of intrusion" that the blockade imposed on Smith's freedom of movement was "minimal" and no greater than the intrusion in *Anderson*. And it noted that Smith had demonstrated a lack of an interest in moving around given that he was stationed in a parking spot and had returned there after being asked to leave.

¶83 Smith, of course, viewed the *Anderson* case differently. He asserted that the "degree of authority" exercised by the police here was "more overt and restrictive" than that in *Anderson*—pointing specifically to the use of a "police vehicle" to "block[] the defendant's car" and to the fact that "three officers in full uniform surrounded" him and "order[ed] him to open the door" of his car. But in so doing, Smith claimed only that there was a seizure and that it was not justified—that the "overt and obvious authority" exercised by the police was enough to "leave a reasonable person to determine he is seized and unable to leave." He nowhere alleged that the challenged practices extended the length of the seizure beyond that which was necessary to check on a motorist (and in fact acknowledged that "the length of the seizure was not long"). And he nowhere identified elements of police practice that increased the degree of burden on his "freedom of movement" beyond that necessary for this admittedly brief seizure.

¶84 This is clear from Smith's response to the State's assertion that Smith (unlike Anderson) was parked and showed no interest in leaving the parking lot. Smith did not claim that the "overt" show of "authority" increased the degree of the burden on his freedom of

LEE, A.C.J., dissenting

movement (or any other Fourth Amendment right).[24] He just claimed that the fact that he was "parked" did not "eliminate the interference" given that "he was actually blocked by police."

¶85 Smith admittedly framed his position in terms of an assertion that the police here "us[ed] an even more overt and restrictive means to detain the Defendant, than in *Anderson*." But he did not challenge the length of the detention and did not claim that the "overt" means increased the burden on the only Fourth Amendment right he identified—his freedom of movement. He contended only that "[t]he overt blocking and surrounding of the Defendant and his vehicle by the police [did] not allow *justification of the seizure* under the community caretaking doctrine." In his view, "there was no perceived emergency and very little if any indication the driver needed aid, certainly not enough to immediately seize the Defendant upon arrival."

## III

¶86 Smith thus identified a single, binary ground for his motion to suppress—the assertion that the police lacked a threshold justification for seizing him in the McDonald's parking lot to see if he needed assistance or posed a danger to others. The State carried its burden of establishing such a justification. And it bore no further obligation to establish the reasonableness of other elements of the police encounter.

¶87 The police received a 3 a.m. report that a person was "driving their car around the parking lot" of a McDonald's "multiple times" and "had fallen asleep at the wheel in a parking stall." On arriving at the McDonald's, the police noticed that the driver had not cut the engine when he reparked the car—it was running in idle. They also observed that the driver was "slumped over the wheel"—asleep or unconscious.

---

[24] Smith did not challenge specific aspects of the police encounter that are called out by the majority, such as the use of "guns and badges" and a "spotlight." *See supra* ¶ 28. And as to aspects of the encounter that he did challenge—the use of multiple officers to block him into a parking spot—he did not claim that there was an increased burden on his freedom of movement.

LEE, A.C.J., dissenting

¶88 This evidence established an objectively reasonable basis for a seizure under the community caretaking doctrine. In these circumstances, "a reasonable officer would have cause to be concerned" that a motorist was in need or posed a danger to others. *State v. Anderson*, 2015 UT 90, ¶ 28, 362 P.3d 1232. "Given the decent odds that a motorist in this situation may need help" or posed a danger to the public, "an officer would have reason to be concerned and to at least stop" and investigate. *Id.* ¶ 29. "Weighing the minimal interference with Mr. [Smith's] freedom of movement occasioned by the deputies' brief seizure against the State's interest in determining whether any occupants of the vehicle required aid," or posed a danger to others under these circumstances, we should hold, as we did in *Anderson*, that "the community caretaking doctrine justified the seizure" in this case. *Id.* ¶ 30.

¶89 The majority nowhere holds that the State lacked a justification for a seizure under the community caretaking doctrine.[25] But it nonetheless reverses the denial of the motion to suppress on the basis of a series of concerns about the scope of the seizure—considerations going to the "reasonableness" of the encounter under a "totality of the circumstances" review. *See supra* ¶ 18 n.2.

¶90 The court highlights specific aspects of the encounter that it finds unreasonable and unjustified by the State—the use of multiple officers to confront Smith, their appearance "in full uniform" with "guns and badges" displayed, and their use of a "spotlight" in an attempt to "gain 'an advantage'" and increase the "display of overt authority." *See supra* ¶¶ 28-29. In the majority's view, these features

---

[25] *See State v. Smith*, 2019 UT App 75, ¶ 24, 442 P.3d 251 (Pohlman, J., dissenting) (acknowledging that "a welfare check of some kind" was surely "warranted" in this case); *supra* ¶ 13 (stating that Judge Pohlman's opinion is the majority's "guiding light"); *supra* ¶ 32 (concluding that the "significant force" displayed by the police was "incommensurate with the minimal need for aid" here—without questioning that there was a need for some sort of seizure to check on Smith's welfare); *supra* ¶ 36 n.7 (disagreeing with my statements but without identifying a specific point on which it disagrees; noting that a welfare check can be performed without a seizure but nowhere identifying a basis for concluding that this welfare check should have been performed without a seizure (or how) and nowhere stating that there was no basis for a seizure in this case).

unnecessarily delayed the seizure beyond the "time it should have taken" to conduct a "welfare check," rendering the seizure "unreasonable" as "incommensurate with" a purportedly "minimal need for aid," and suggesting that community caretaking was "secondary" to a purpose of criminal investigation. *See supra* ¶¶ 29, 32.

¶91   I disagree on all counts. The court's analysis is problematic because it: (a) questions aspects of police procedure that were either not challenged by Smith at all or not alleged to have increased the burden on the Fourth Amendment interest he identified—his freedom of movement; (b) rests on Fourth Amendment interests that were either not claimed by Smith or are not cognizable under the law; and (c) distorts established principles of law under the community caretaking doctrine.[26]

A

¶92   Smith failed to challenge some elements of police procedure questioned by the majority. At no point in the district court proceedings did Smith claim that his Fourth Amendment rights were infringed by the use of "guns and badges" or a "spotlight."[27] The State thus had no notice of a need to carry a burden of putting on evidence that could show that these aspects of the police encounter were "[]commensurate with" the relative need for aid in these circumstances. *See supra* ¶ 32 (faulting the State on the basis of its failure to carry this burden).

¶93   Smith did challenge the use of a "police vehicle" to "block[]" his car and claimed that he was improperly seized when "three

---

[26] Some of the concerns highlighted by the majority conceivably could give rise to a viable constitutional claim under *Anderson*. *See supra* ¶ 36 n.7 (invoking *Anderson* as the basis for considering a range of unpreserved issues). But *Anderson* does not obviate the defendant's burden of production. It just identifies a range of claims that a defendant can assert.

[27] The "facts" underlying these matters admittedly were mentioned in the district court. *See supra* ¶ 40. But Smith never asserted a basis for a finding that the "guns and badges" or "spotlight" infringed his rights under the Fourth Amendment. And the bare existence of existence of evidentiary facts has never been a basis for requiring the State to imagine and refute any and all possible grounds for a Fourth Amendment claim.

officers in full uniform surrounded" him and "order[ed] him to open the door" of his car. And he generally asserted that the "degree of authority" exercised by the police here was "more overt and restrictive" than that in *Anderson.* His ultimate claim, however, was the above-noted binary one—that the "overt and obvious authority" exercised by the police amounted to a seizure and the seizure was not justified. Smith made no attempt to connect the use of three officers to block his movement with a police car with a challenge to the scope or length of the seizure, or to assert that these elements of police practice increased the degree of burden on his "freedom of movement" beyond that necessary for a brief inquiry into whether he needed assistance or posed a danger to others.[28]

¶94 Any such claims are not legally viable in any event. Smith's freedom of movement could not have been limited during a period when he was "asleep" and "unaware of the first officer's arrival." *Supra* ¶ 29. The call for backup occasioned some sort of delay and the

---

[28] Smith did "allege[] that the 'initial seizure ... *and also the searches that followed* were conducted without a valid search warrant, and without any applicable exception to the warrant requirement." *Supra* ¶ 38. But he preserved no basis for a challenge to the scope or extent of any search or seizure. He asserted only that there was no threshold basis for the police to detain him. And for that reason his vague references to a "search" left the State with no challenge to refute in carrying its burden of persuasion.

The defect in Smith's motion was not a lack of "magic words." *Supra* ¶ 38. It was the failure to identify the substance (using any words) of a challenge to the scope or extent of any search or seizure. By focusing only on the alleged intrusion on his freedom of movement and asserting only that the police lacked a threshold basis for seizing him, Smith left the state with no basis for carrying a burden of persuasion on anything other than that threshold basis.

The district court judge was a "reasonable jurist" and the prosecution was a "reasonable . . . party." *Supra* ¶ 39. And neither of them understood that Smith was somehow asserting an infringement of a "right to privacy." *Supra* ¶ 39. The district court admittedly mentioned the interest in "privacy" in its decision—in a reference to *Anderson. Supra* ¶ 39. But it did not proceed to analyze the reasonableness of any possible infringement of that interest because Smith never identified a basis for such a claim. It focused only on the "restriction on [Smith's] freedom of movement."

officers eventually blocked him in and thereby seized him. But the delay had no impact—Smith's freedom of movement was not impeded in his somnolent state, and the delay thus imposed no burden on his Fourth Amendment rights. *See supra* ¶ 26 n.3 (conceding that we are here considering only the "small window of time" before the police "engaged with Smith and observed his intoxicated state" since "they obtained probable cause" at that point and thus "any further police action" need not "be justified under the community caretaking doctrine").

¶95 This is a separate barrier to reversal of the denial of Smith's motion to suppress. The court may wonder why it was necessary for a police officer "to wait for backup before approaching Smith," and believe that this delay was "inconsistent with the time it should have taken" for the police to determine whether a motorist was in need or posed a danger to others. *Supra* ¶ 29. But these are not legally viable grounds for establishing an intrusion on Smith's interests under the Fourth Amendment. And they are an improper basis for the court's decision even if we ignore the above-noted preservation problems.

B

¶96 Smith's motion was rooted entirely in the claim that the police intruded on his freedom of movement. No other Fourth Amendment interest or right was identified. The State thus had no notice of the need to carry a burden of putting on evidence justifying the "time" or length of the seizure, *supra* ¶ 29, explaining the need for an "overt" "display" or show of "authority," *supra* ¶ 29, supporting the need to use a spotlight to "gain 'an advantage over'" a motorist, *supra* ¶ 29, rebutting concerns about an invasion of "privacy," *supra* ¶ 28, or establishing a basis for aspects of police conduct that may seem to amount to "an 'annoying, frightening, and perhaps humiliating experience,'" *supra* ¶ 29 n.4 (citing *Terry v. Ohio,* 392 U.S. 1, 25 (1968)).

¶97 Some of these rights are potentially cognizable. The Fourth Amendment protects a right to be "secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. And that guarantee opens the door to a claim that a given police practice amounts to a "search" invading a "reasonable expectation of privacy," *Katz. v. United States,* 389 U.S. 347, 360 (1967) (Harlan, J., concurring), or a "seizure" that extends for longer than is necessary to accomplish a reasonable objective of the government, *State v. Martinez,* 2017 UT 43, ¶ 12, 424 P.3d 83. *See also Anderson,* 2015 UT 90, ¶ 26 (noting that a

LEE, A.C.J., dissenting

court may evaluate whether a "community caretaking stop" "intrudes upon a citizen's freedom of movement and privacy").

¶98 But Smith preserved a claim to none of these rights. He nowhere alleged that the police had effected an unreasonable "search" or invaded a right of "privacy." And he nowhere contended that the search was extended for longer than necessary for a community caretaking seizure. That should be the end of the matter. We are in no position to assert unclaimed Fourth Amendment rights on Smith's behalf in proceedings on appeal.

¶99 We likewise are in no position to devise new Fourth Amendment rights not rooted in our law. We may be troubled by the "significant force" or "display of authority" used by the police. *Supra* ¶¶ 31–32. We may find it improper for police to shine a spotlight on a motorist to "gain 'an advantage over'" him. *Supra* ¶ 28. And we may believe that "being surrounded by multiple officers and their vehicles" in a McDonald's parking lot is "an 'annoying, frightening, and perhaps humiliating experience.'" *See supra* ¶ 29 n.4 (quoting *Terry*, 392 U.S. at 25 in support of this view). But there is no Fourth Amendment right to be free from a "significant" show of "force" or "authority" or to use methods of gaining an "advantage over" others, just is there is no right to be spared from forms of annoyance, fright, or humiliation that may trouble a panel of judges.[29]

---

[29] I of course agree that the reasonableness of a search or seizure may "'depend[] not only on *when* it is made, but also on *how* it is carried out.'" *Supra* ¶ 37 n.10 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). If a search or seizure exceeds the bounds of the means necessary to accomplish its intended purpose, the defendant may be able to identify a ground on which it is unreasonable in its scope or execution. *See, e.g., Graham*, 490 U.S. at 389-90 (noting that the defendant alleged that officers used "excessive force" in stopping him, causing "a broken foot, cuts on his wrist, a bruised forehead, and an injured shoulder"). But that hardly renders it "irrelevant" whether the defendant's alleged interest is "cognizable under the Fourth Amendment." *Supra* ¶ 37 n.10. Surely it is the moving party's burden to claim an infringement of a constitutionally protected right. And the court cannot credibly claim otherwise without abrogating a core element of our well-settled law.

Smith did not identify a basis for establishing a Fourth Amendment right to be free from a "significant show of force" or

(continued …)

LEE, A.C.J., dissenting

¶100 The majority cites the *Terry* case in support of its contrary conclusion. But *Terry* cuts the other way. It establishes a standard for assessing an invasion of a right to privacy in a pat-down of a person's "outer clothing," *Terry,* 392 U.S. at 29, during a traffic stop—in a holding that establishes that such a search is reasonable if performed upon reasonable suspicion—a "warranted . . . belief that [the officer's] safety or that of others was in danger." *Id.* at 27. Smith never asserted that the police had effected an unlawful pat-down or other search and never claimed that there was an invasion of a right of privacy. And we should not be reversing the denial of his motion to suppress on the basis of new rights or concerns that he failed to claim or preserve.

## C

¶101 It may strike us as unreasonable for the police to initiate an investigation into a possible DUI and later seek to justify its conduct based on "secondary," "*post-facto*" concerns for the welfare of a motorist or his possible danger to others. *Supra* ¶ 32. But this is not a proper basis for analysis under the Fourth Amendment. Controlling precedent makes clear that "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (second alteration in original). A police officer may begin with a suspicion of criminal activity, and be motivated by a subjective interest in investigating it. But the officer's "subjective motivation is irrelevant." *Id.* The question is objective reasonableness. And the inquiry "has nothing to do with discerning what is in the mind of the individual officer conducting the search." *Id.* at 405.

¶102 The majority gives a nod to the notion that "the priority of the officers' motives in effectuating the stop is irrelevant." *Supra* ¶ 32 n.5. But it pivots the other way with its concerns about the "secondary" or *"post-facto"* nature of the police officers' "purpose in ascertaining Smith's wellbeing," *supra* ¶ 32, and with its conclusion that "the officers' response smacked of a criminal investigation

---

"authority" or from the use of methods of "gaining an advantage." And this court is in no position to do this work for him, or to blame me for failing to "cite to a[] case" establishing that this is *not* a constitutional right. *See supra* ¶ 37 n.10.

purpose from the start," *supra* ¶ 28. This is problematic. It overrides our settled case law.

¶103 The court takes further steps away from the case law in resting its decision on the lack of "objective evidence" that Smith had had "a medical incident requiring immediate aid," *supra* ¶ 31, or had "expressed a need for assistance" by the police, *supra* ¶ 30. These conclusions alter the operative standard. The police are not limited to "rendering first aid to casualties." *Brigham City*, 547 U.S. at 406. They are not "boxing" referees "poised to stop a bout only if it becomes too one-sided," *id.*, or EMTs restricted to providing a medical intervention when it is "immediate" or requested. They are police officers with a community caretaking function, which encompasses the authority to intervene when they have "an objectively reasonable basis for believing . . . that [an] injured adult might need help." *Id.*

¶104 This is sufficient under our case law. A seizure is justified under the community caretaking doctrine where there is a "good chance" that "a motorist . . . may need help," such that "an officer would have reason to be concerned and to at least stop to determine whether assistance is needed." *Anderson*, 2015 UT 90, ¶ 29. That is what happened here. The police "detained" Smith "only long enough" to determine whether he needed aid, *id.* ¶ 27, or posed a danger to others. The State justified the detention as a reasonable inquiry into these concerns. And the majority has altered our law in reversing on other grounds.

## IV

¶105 The Fourth Amendment is not a license for an "unconfined," *Chimel v. California* , 395 U.S. 752, 765 (1969), case-by-case balancing of the "subjective . . . acceptability" of the elements of a given police encounter, *id.* 764. It is a constitutional charter guided by an objective inquiry, whose application is limited by the law of preservation and the burdens established by our justice system.

¶106 The majority takes our law in a distinctly different direction. It second-guesses aspects of a police encounter that were not challenged by the defendant. It raises Fourth Amendment rights that were not raised by the defendant or are not cognizable under our law. And it faults the State for not anticipating and addressing the concerns the court has under its totality of the circumstance review for reasonableness.

¶107 This is troubling. The court is overriding established principles of preservation, reworking operative burdens of proof,

and altering established principles of Fourth Amendment case law. And in so doing it is making it impossible for the lower courts or the police to conform their decisions to the demands of the law in this important field—a field that is now seemingly governed by the views of a majority of the court on what is "reasonable," under a "totality of the circumstances" review that encompasses considerations not preserved in the district court. *See State v. Rabinowitz*, 339 U.S. 56, 83 (1950) (Frankfurter, J., dissenting) (noting that it is insufficient just "[t]o say that [a] search must be reasonable" and warning that that is "no guide at all . . . for district judges or the police").

———————————